**In the Matter of the COMMITMENT OF Benjamin STEINBERG, Requested by St. Vincent Hospital d/b/a St. Vincent Stress Center.**

No. 49A05–0311–CV–579.

Court of Appeals of Indiana.

Oct. 20, 2004.

Publication Ordered Dec. 3, 2004.

Janice L. Stevens, Indianapolis, IN, Attorney for Appellant.

Angela M. Smith, Hall, Render, Killian, Heath & Lyman Indianapolis, IN, Attorney for Appellee.

## OPINION

BAKER, Judge.

Appellant-respondent Benjamin Steinberg appeals his involuntary commitment to a mental health facility. Specifically, he contends that the evidence was insufficient to support the trial court's findings that he was mentally ill, dangerous, or gravely disabled. Finding that the State did not carry its burden of proof with respect to the elements of dangerousness and grave disability, we reverse and remand with instructions to vacate the order of involuntary commitment.

## FACTS [1]

The evidence most favorable to the judgment reveals that Steinberg has a family history of schizophrenia, which tends to manifest in paternal relatives in their early twenties. Steinberg's mother, Gayla Steinberg (Mother), had noticed that her twenty-four-year-old son had been exhibiting signs of increasing paranoia for nearly two years prior to his involuntary detention. Steinberg told Mother that his roommates were speaking through his computer speakers, repeating conversations they had. Steinberg would laugh out loud for no reason in the middle of the night and in the shower. Mother testified that she believes Steinberg is a danger because he drives between Bloomington and Indianapolis, and she fears he may

---

1. We hereby grant Steinberg's motion to strike filed on May 12, 2004. The relevant portions of Appellee's brief have been stricken and were not considered in this appeal.

"mentally go away" while driving. Tr. p. 16.

Mother testified that Steinberg has an "explosive and almost immediate" anger that he has "a real difficult time controlling." Tr. p. 16. At the time of the hearing, Steinberg had received a deferred charge of battery and had charges pending against him for public intoxication and for pointing a firearm. The firearm charge stemmed from an incident in which Steinberg pointed an unloaded gun at a group of three people who threatened him and his roommate.

Steinberg had invented a reusable glow stick and contacted a patent attorney in late 2002. His attorney is in the process of preparing a patent, and Steinberg has been in negotiations with Omni Glow, a leader in the glow stick industry. After two and one-half years of college, Steinberg dropped out of school to pursue this business opportunity. Steinberg's patent attorney testified that the invention could earn millions of dollars during the lifetime of the patent. Steinberg's parents divorced in 1995. Mother requested a loan from Steinberg in late October 2003. Steinberg initially agreed to help, but he later became upset that Mother did not manage her money responsibly. He told her he would help if she started working.

On October 29, 2003, Mother brought Steinberg to St. Vincent Stress Center (St. Vincent) for evaluation and emergency detention. Mother believed that Steinberg was suffering from a psychiatric disorder and alcoholism, based in part upon her observations of Steinberg's "suspicious" nature, "uncontrollable anger at times," "persecutory delusions," and his apparent response to "voices." Appellant's App. p. 7.

Dr. Sanjay Mishra performed an initial psychiatric evaluation on Steinberg. Steinberg told Dr. Mishra that he had dropped out of school to pursue a lucrative business venture for which he was purportedly expecting a check for one million dollars that weekend, which Dr. Mishra thought showed that Steinberg was delusional. He also told Dr. Mishra that he believed his roommates were conspiring against him and had tampered with his personal computer in order to eavesdrop on him. Steinberg also admitted to Dr. Mishra that his alcohol use had been excessive, that his family was very concerned about this, and that there was currently a warrant out for his arrest. Dr. Mishra also noted that Steinberg had not exhibited dangerous or threatening behavior and was not self-injurious or suicidal. Although Steinberg was agitated during his initial period of detention, he was treated with anti-psychotic medications with a resultant reduction in his agitation.

 Dr. Mishra made a preliminary diagnosis of schizophrenia with other potential diagnoses, including a delusional disorder and a thought disorder. On November 4, 2003, St. Vincent faxed the report following emergency detention to the probate court, alleging that Steinberg suffers from a psychotic disorder and is gravely disabled. Following the commitment hearing on November 6, 2003, the probate court ordered Steinberg temporarily committed after finding that Steinberg suffered from a mental illness, was dangerous, was gravely disabled, and was in need of commitment to an appropriate treatment facility for a period of not more than ninety days. Steinberg's commitment expired on February 4, 2004,[2] and he now appeals.

---

**2.** Inasmuch as Steinberg has now been discharged from the hospital, this matter is moot. While generally, we dismiss cases that are deemed to be moot, a moot case may be

## DISCUSSION AND DECISION

Steinberg argues that the evidence was insufficient to support his commitment. Specifically, he contends that there was no evidence to show that he had a mental illness, was dangerous, or was gravely disabled.

■ A court may order temporary commitment for a period of up to ninety days if a petitioner proves by clear and convincing evidence that the individual is: (1) mentally ill; and (2) either dangerous or gravely disabled. Ind.Code § 12–26–6–1. When reviewing an order of commitment, we will consider the evidence favorable to the judgment and all reasonable inferences therefrom. *In re Commitment of Heald v. Blank,* 785 N.E.2d 605, 613 (Ind.Ct.App.2003). If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, the order must be affirmed, even if other reasonable conclusions are possible. *Id.*

### I. Mental Illness

■ Steinberg argues that there was no evidence that he suffered from a mental illness because Dr. Mishra only testified to a "working diagnosis" of schizophrenia. Tr. p. 5. A mental illness is defined as a psychiatric disorder that substantially disturbs an individual's thinking, feeling or behavior and impairs the individual's ability to function. Ind.Code § 12–7–2–130.

Evidence was presented to the probate court that Steinberg has a family history of schizophrenia that tends to manifest itself at approximately Steinberg's age. Tr. p. 15–16. Dr. Mishra testified that his working diagnosis is schizophrenia along with other potential disorders such as psychotic disorder NOS (not otherwise specified), delusional disorder, and some sort of thought disorder. Tr. p. 5. Dr. Mishra also testified that he was concerned about the "paranoid type features in [Steinberg's] presentation." Tr. p. 8.

Steinberg argues, without citation to authority, that a working diagnosis is somehow less reliable than an "actual diagnosis." Appellant's Br. p. 7. However, because one could reasonably rely on the information provided by Dr. Mishra, we will not disturb the trial court's finding that the State satisfied the "mentally ill" element of Indiana Code section 12–26–6–1.

### II. Dangerousness

■ Steinberg next contends that the probate court erred in finding that he was dangerous "with trips to and from Bloomington, as well as the testimony as far as delusions and what they could lead to." Tr. p. 35. The term "dangerous," for involuntary commitment purposes, means "a condition in which an individual, as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." I.C. § 12–7–2–53.

While Mother testified that she was concerned that Steinberg would "mentally just [go] away" on his trips to Bloomington, tr. p. 16, no evidence whatsoever was presented that this had indeed happened or was likely to happen. Thus, any potential for danger in this regard was purely speculative, and the probate court should not have considered this as proof of dangerousness.

decided on its merits when it involves questions of great public interest that are likely to recur. *See, e.g., In re Commitment of J.B.,* 766 N.E.2d 795, 798 (Ind.Ct.App.2002). The question of how persons subject to involuntary commitment are treated by our trial courts is one of great importance to society. *Id.* Moreover, this case involves the proof necessary for involuntary commitment. This is an issue of great public importance and is likely to recur, so we will address it here. *See id.*

As for "delusions and what they could lead to," we can only surmise that the probate court was referencing an incident in which Steinberg pointed an unloaded gun at a group of three people who threatened him and his roommate. While this may have been risky behavior, this is "too slender a thread to support an involuntary commitment." *In re Commitment of J.B.,* 581 N.E.2d 448, 452 (Ind.Ct.App.1991) (where dangerousness element supported only by fact that J.B. ran away through traffic at a busy intersection on two instances and hitchhiked once). This is not a case where anyone was murdered or even harmed by Steinberg's conduct. Standing alone, this conduct does not form a sufficient basis for a determination that he is dangerous.

### III. Gravely Disabled

■ Steinberg finally contends that his involuntary commitment was erroneous because there was no evidence to support the trial court's finding that he was gravely disabled. The State presented no argument in its brief against Steinberg's contention in this regard. Therefore, we will review this issue for prima facie error. *Nat'l Oil & Gas, Inc. v. Gingrich,* 716 N.E.2d 491, 496 (Ind.Ct.App.1999) (holding that the failure to respond to an issue raised by the appellant is akin to the failure to file a brief; therefore we may reverse upon a showing of prima facie error.)

"Gravely disabled", for purposes of IC 12–26, means a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:

(1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or

(2) has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior that results in the individual's inability to function independently.

I.C. § 12–7–2–96.

No evidence was presented here that Steinberg was unable to provide for any of his needs. In fact, Dr. Mishra testified that Steinberg was able to independently go about his activities of daily living while hospitalized at St. Vincent. Tr. p. 10. Steinberg maintains an apartment in Bloomington, where he lives with a roommate. Tr. p. 25. Nothing in the record indicates that Steinberg was unable to provide for his essential human needs or that he was unable to function independently. Thus, we find that the probate court erred in finding that Steinberg was gravely disabled within the meaning of Indiana Code section 12–7–2–96.

### CONCLUSION

While the evidence was sufficient to support the finding that Steinberg suffered from a mental illness, the probate court erred in finding that Steinberg was dangerous or gravely disabled. Inasmuch as the statute requires the respondent to be either dangerous or gravely disabled, the involuntary commitment order cannot stand.

The judgment of the probate court is reversed and remanded with instructions to vacate the order of involuntary commitment.

ROBB, J., concurs.

KIRSCH, C.J., dissents.

### ORDER

This Court having heretofore issued its opinion in this appeal on October 20, 2004, marked Memorandum Decision, Not for Publication.

The Appellant, by counsel, has filed a Verified Motion for Publication, alleging

therein that said opinion provides a sound discussion of the proof necessary for involuntary commitment, involves issues of substantial public importance and should be published.

The Court having reviewed said opinion, have examined said Motion for Publication and being duly advised, now finds that the motion for publication should be granted.

IT IS THEREFORE ORDERED that the Appellant's Verified Motion for Publication is GRANTED, and this Court's opinion heretofore handed down in this appeal on October 20, 2004, marked Memorandum Decision, Not for Publication, is now ordered PUBLISHED.

All Panel Judges Concur.