**In the Matter of the Commitment of M.Z., Appellant–Respondent,**

**v.**

**CLARIAN HEALTH PARTNERS, Appellee–Petitioner.**

**No. 49A02–0410–CV–897.**

Court of Appeals of Indiana.

June 24, 2005.

Joel M. Schumm, Indianapolis, for Appellant.

Michele J. Calderon, Clarian Health Partners, Inc., L. Alan Whaley, Brian E. Bailey, Indianapolis, for Appellee.

## OPINION

ROBB, Judge.

M.Z. appeals the trial court's order involuntarily committing him to a mental health facility. We affirm.

### Issue

M.Z. raises one issue for our review, which we restate as whether sufficient evidence was presented to support the trial court's order involuntarily committing M.Z. to a mental health facility.

### Facts and Procedural History

At the time of the commitment hearing, M.Z. was fifty-two years old and was employed at the Daimler Chrysler foundry in Indianapolis. M.Z. had worked at the Daimler Chrysler foundry for nearly twenty years, where he was responsible for maintaining machinery. M.Z. lived by himself

and testified that he owned several guns. M.Z. used these guns for hunting and kept them in a gun safe located inside his home. M.Z. related that because he was the victim of an armed robbery, on a daily basis, as soon as he enters his home, he removes a gun from the gun safe.

On September 23, 2004, M.Z. became concerned about some stains that he saw on a stairwell at work. M.Z. thought that these stains were bloodstains. M.Z. believed that these bloodstains might be related to some kind of plot at work, and that somehow this plot threatened his safety. M.Z. therefore contacted the Marion County Sheriff's Department to report his concerns about the bloodstains. When officers arrived at M.Z.'s home, he let them inside. Once inside, the officers saw a gun that M.Z. had removed from his gun safe sitting on the kitchen counter. M.Z. informed the officers about the stains that he had seen at work and requested that they conduct DNA testing on the bloodstains. After M.Z. related his concerns about the bloodstains, the officers requested that M.Z. accompany them to Methodist Hospital, which M.Z. did. The officers took M.Z. to Methodist Hospital for immediate detention as a mentally ill and dangerous person.

Shortly after his admission to Methodist Hospital, Dr. Anne Gilbert, a psychiatrist, began treating M.Z. Dr. Gilbert diagnosed M.Z. as suffering from chronic paranoid schizophrenia. Dr. Gilbert testified that M.Z. had pervasive paranoia about a possible plot at work. This plot somehow involved a cult, possibly a satanic cult, and M.Z. believed that he might be one of its targets. Dr. Gilbert indicated that M.Z. appeared to be frightened for his own safety. During his stay at Methodist, Dr. Gilbert stated that M.Z.'s paranoia had globalized such that M.Z. was paranoid about his roommate's coughing. Dr. Gil-

bert also indicated that M.Z. did not believe that he had a mental illness, and that if M.Z. were released from his commitment he would stop taking any medications since he did not believe that he was ill.

On September 28, 2004, Clarian Health Partners ("Clarian") filed a petition for M.Z.'s involuntary commitment, alleging that M.Z. suffered from a psychiatric disorder and was dangerous to others. The trial court held a commitment hearing on October 6, 2004. Dr. Gilbert testified at this hearing. When asked if she believed that M.Z.'s psychiatric condition rendered him a danger to others, Dr. Gilbert replied, "I believe it could. Yes." Tr. at 10. Clarian's counsel then asked Dr. Gilbert, "And, is the paranoia and the thought of the plot combined with the access to weapons, gives you cause for concern that he would be a danger to others?" *Id.* Dr. Gilbert answered, "That's correct." *Id.* Dr. Gilbert also stated, "I would worry that he would become so frightened, that he might inadvertently harm someone, feeling he was protecting himself." *Id.* at 12. On cross-examination, Dr. Gilbert admitted that she was not aware of M.Z. having any history of actual violence.

M.Z. also testified at the hearing. He stated that in 1993 he was treated at the St. Vincent's Stress Center and was diagnosed with schizophrenia and bipolar disorder. M.Z. indicated that he had never had any thoughts of committing a violent act upon someone at work. On cross-examination, though, M.Z. testified that while at work three of his supervisors saw him release some suspended machinery that crashed to the floor. M.Z.'s supervisors considered this a violent act, and, as a result, M.Z. was sent for treatment at the Alpine Clinic in Lafayette, Indiana.

At the conclusion of the hearing, the trial court issued an order finding that M.Z. suffered from chronic paranoid

schizophrenia, a mental illness. The trial court also found that M.Z. posed a danger to others and was gravely disabled. The trial court ordered that M.Z. should be temporarily committed for a period of ninety days ending on January 4, 2005. This appeal ensued.

### Discussion and Decision

M.Z. argues that Clarian failed to present sufficient evidence to support his involuntary commitment. We disagree.

■■■ Initially, we note that at this time, M.Z. has likely been discharged from the hospital, and, therefore, this matter is moot. In general, virtually every case that comes before us involving a temporary involuntary commitment to a mental health facility is moot due to the amount of time it takes to bring an appeal. We generally dismiss cases that are deemed to be moot. *In re Commitment of Steinberg,* 821 N.E.2d 385, n. 2 (Ind.Ct.App.2004). However, a moot case may be decided on its merits when it involves questions of great public interest that are likely to recur. *Id.* "The question of how persons subject to involuntary commitment are treated by our trial courts is one of great importance to society." *Id.* This case also involves the proof necessary for involuntary commitment. Since both of these issues are of great public importance and are likely to recur, we will address this case on its merits. Additionally, we choose to address this case on the merits because it is a close case.

### I.  Standard of Review

■■■ When reviewing a challenge to the sufficiency of the evidence with respect to commitment proceedings, we will only look to the evidence most favorable to the trial court's decision and all reasonable inferences drawn therefrom. *Golub v. Giles,* 814 N.E.2d 1034, 1038 (Ind.Ct.App.

2004), *trans. denied.* In reviewing the evidence supporting the judgment, we may neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* "Where the evidence is in conflict, we are bound to view only that evidence that is most favorable to the trial court's judgment." *Id.* If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, we will affirm the order even if other reasonable conclusions are possible. *Id.*

### II.  Sufficiency of the Evidence

■■■ The trial court ordered that M.Z. should be temporarily committed for a period of ninety days. A trial court may order the temporary commitment of an individual for a period of up to ninety days if a petitioner proves by clear and convincing evidence that the individual is (1) mentally ill; and (2) either dangerous or gravely disabled. Ind.Code § 12–26–6–1. M.Z. does not challenge the trial court's finding that he suffers from a mental illness, namely chronic paranoid schizophrenia. However, M.Z. argues that Clarian failed to present clear and convincing evidence that he is gravely disabled or dangerous to others. It is important to note that in order to carry its burden of proof, Clarian only had to prove that M.Z. was either gravely disabled *or* dangerous. It did not have to prove both of these elements.

■■■ We first consider whether Clarian presented clear and convincing evidence that M.Z. was dangerous. Indiana Code section 12–7–2–53 defines "dangerous" as "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." The trial court concluded that M.Z. was only dangerous to others and not to himself. Therefore, we must determine whether Clarian presented

sufficient evidence to prove that M.Z. posed a substantial risk to others.

M.Z. begins by arguing that Clarian failed to present sufficient evidence that he was dangerous to others because it failed to show that he had ever harmed or threatened to harm others. M.Z. contends that the trial court's principal reason for ordering his involuntary commitment was his possession of firearms. M.Z., though, points out that Clarian failed to introduce any evidence that he had a history of harming or threatening to harm another person through the use of his firearms. He asserts that his mere possession of firearms, absent any suggestion of his ever using them against another person, does not present a basis for concluding that he poses a substantial risk to others. A trial court, however, is not required to wait until a physical act is visited upon an individual before determining that an individual poses a substantial risk of harm to others. *Matter of Commitment of Gerke*, 696 N.E.2d 416, 421 (Ind.Ct.App.1998). Therefore, although M.Z. had no history of using or threatening to use his firearms upon another individual, this does not preclude the trial court from finding that M.Z. posed a substantial risk to others.

■ M.Z. seems to contend that the trial court involuntarily committed him, if not solely then largely, because he possessed firearms and that this conclusion was erroneous because he had a right to possess firearms pursuant to the Second Amendment to the United States Constitution and Article 1, Section 32 of the Indiana Constitution. The evidence introduced at the commitment hearing indicated that (1) M.Z. possessed firearms that he kept in a gun safe; (2) on a daily basis, upon entering his home, M.Z. would remove a gun from the gun safe; and (3) when the police entered M.Z.'s home they noticed a gun sitting on his kitchen counter.

Although M.Z. is correct that he did have a right to possess firearms under both the United States Constitution and the Indiana Constitution, M.Z.'s possession of firearms was not the sole basis for the trial court's conclusion that M.Z. posed a danger to others and should be involuntarily committed. At the commitment hearing, Clarian presented substantial evidence, besides M.Z.'s possession of firearms, which showed that M.Z. posed a substantial risk to others. Dr. Gilbert testified that M.Z. was suffering from chronic paranoid schizophrenia. She stated that M.Z. had pervasive paranoia about a possible plot at work that somehow involved a cult, and that he might be a target of this plot. M.Z. told Dr. Gilbert that the cult might be a satanic cult. Dr. Gilbert believed that M.Z.'s paranoia about the plot at work caused him to fear for his own safety. M.Z.'s fear for his safety was such that after seeing what he thought was a bloodstain on a stairwell at work, he called the police and asked that they conduct DNA testing on the stain. Dr. Gilbert indicated that after M.Z. was admitted to Methodist Hospital, his paranoia globalized to the point that he had become paranoid about his roommate's coughing. Dr. Gilbert related that M.Z. did not believe that he suffered from a mental illness and that it was likely that if he were released from his commitment he would not take any medications for his mental illness. M.Z. testified that on one occasion while at work he released some suspended machinery that crashed to the floor. Three of M.Z.'s supervisors saw this and considered it to be a violent act. As a result of these actions, M.Z. was sent for treatment at the Alpine Clinic in Lafayette. Dr. Gilbert testified that she believed that M.Z.'s mental condition could render him dangerous to others. She indicated that it was M.Z.'s

paranoia combined with his fear of a plot at work and his access to firearms that caused her to believe that M.Z. could be a danger to others. Dr. Gilbert specifically stated that her concern was that M.Z. "would become so frightened, that he might inadvertently harm someone, feeling he was protecting himself." Tr. at 12.

Based on this evidence along with the evidence of M.Z.'s possession of firearms, a reasonable person could have concluded that M.Z. posed a substantial risk of harm to others, and, thus, was dangerous. Therefore, Clarian did present sufficient evidence to support the trial court's order involuntarily committing M.Z. to a mental health facility.

However, M.Z. argues that *Commitment of J.B. v. Midtown Mental Health Ctr.,* 581 N.E.2d 448 (Ind.Ct.App.1991), *trans. denied,* and *In re Commitment of Steinberg* suggest that Clarian did not present sufficient evidence to prove that M.Z. was dangerous. M.Z. notes that in both of these cases we concluded that insufficient evidence was presented to permit the trial court to find that the involuntary commitment was dangerous. *Commitment of J.B.,* 581 N.E.2d at 452; *In re Commitment of Steinberg,* 821 N.E.2d at 388–89. M.Z. argues that because his behavior was less dangerous than the behavior exhibited in *Commitment of J.B* and *In re Commitment of Steinberg,* Clarian failed to present sufficient evidence that he was dangerous. Initially, we note that in *Commitment of J.B.* we only considered whether the involuntary committee was a danger to herself and not whether she posed a danger to others. Therefore, *Commitment of J.B.* is distinguishable.

In *In re Commitment of Steinberg,* the involuntary committee, Steinberg, was twenty-four years old. Steinberg's mother testified that his family had a history of schizophrenia and that the illness usually developed in the subject's early twenties. Steinberg had, according to his mother, been exhibiting signs of paranoia. He believed that his roommates were conspiring against him. Steinberg admitted that he had been drinking alcohol excessively. Steinberg also had anger management issues. On one occasion, Steinberg pointed an unloaded firearm at three individuals who had threatened him and his roommate. Steinberg had recently invented a reusable glow stick and was in the process of having the invention patented. A patent attorney testified that Steinberg could potentially make millions of dollars from the invention throughout the lifetime of the patent. In October of 2003, Steinberg's mother requested a loan from him, but Steinberg refused to help her unless she got a job. Later that month, Steinberg's mother took him to St. Vincent Stress Center for emergency detention. While there, Steinberg was diagnosed as suffering from schizophrenia. A petition for Steinberg's involuntary commitment was later filed, and the trial court granted this petition finding that Steinberg was dangerous.

On appeal, Steinberg argued that insufficient evidence had been presented to justify the trial court's finding that he was dangerous. The trial court agreed with Steinberg's mother that Steinberg was dangerous because he could cease to be mentally lucid during one of his many trips to Bloomington. We noted that there was no evidence that this had ever happened or was likely to happen. *In re Commitment of Steinberg,* 821 N.E.2d at 388. We concluded that the potential that this might occur was purely speculative and should not have been considered as proof of dangerousness. *Id.*

The trial court also concluded that Steinberg was dangerous because he suffered

from delusions. We could only surmise that this referred to the incident in which Steinberg pointed an unloaded firearm at three individuals who had threatened him and his roommate. With regard to Steinberg's actions, we stated, "While this may have been risky behavior, this is 'too slender a thread to support an involuntary commitment.'" *Id.* at 389 (quoting *In re Commitment of J.B.*, 581 N.E.2d at 452). We determined that "[t]his is not a case where anyone was murdered or even harmed by Steinberg's conduct. Standing alone, this conduct does not form a sufficient basis for a determination that he is dangerous." *Id.* We ultimately concluded that insufficient evidence had been presented to support the trial court's finding that Steinberg was dangerous. *Id.*

M.Z. contends that Steinberg's behavior is more dangerous than his own because Steinberg actually threatened three individuals with an unloaded gun, whereas there is no evidence that M.Z. has threatened or actually harmed anyone with his firearms. However, as we have already stated, a trial court is not required to wait until a physical act is committed upon an individual before determining that an individual poses a substantial risk of harm to others. *Matter of Commitment of Gerke*, 696 N.E.2d at 421. The evidence here indicates that M.Z. suffers from chronic paranoid schizophrenia. Dr. Gilbert testified that M.Z. has pervasive paranoia concerning a plot at work involving a cult of which he believes he is a target. M.Z.

testified that he owns more than one gun and that on a daily basis, upon entering his home; he removes a gun from his gun safe. When the police arrived at M.Z.'s home, they saw a gun sitting on his kitchen counter. Dr. Gilbert was concerned that M.Z.'s paranoia might cause him to become so frightened that he would "inadvertently harm someone, feeling he was protecting himself." Tr. at 12. Based on this evidence, a reasonable person could conclude that M.Z. posed a substantial risk to others. Therefore, sufficient evidence was introduced to support the trial court's conclusion that M.Z. posed a danger to others and should be involuntarily committed to a mental health facility.[1]

### Conclusion

Sufficient evidence was presented to support the trial court's conclusion that M.Z. was dangerous to others. The trial court's order involuntarily committing M.Z. to a mental health facility is therefore affirmed.

Affirmed.

FRIEDLANDER, J., and BAILEY, J., concur.

---

1. Because we conclude that sufficient evidence was introduced to prove that M.Z. was dangerous to others, we need not consider

M.Z.'s argument that Clarian produced insufficient evidence to support the trial court's conclusion that he was gravely disabled.