## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Sep 23 2020, 9:26 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald R. Shuler
Barkes, Kolbus, Rife & Shuler, LLP
Goshen, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Civil Commitment of M.L.,

*Appellant-Respondent,*

v.

Madison State Hospital,

*Appellee-Petitioner.*

September 23, 2020

Court of Appeals Case No.
20A-MH-610

Appeal from the Elkhart Superior Court

The Honorable Teresa L. Cataldo, Judge

Trial Court Cause No.
20D03-1807-MH-553

**Pyle, Judge.**

# Statement of the Case

M.L. ("M.L.") appeals the trial court's order for his involuntary regular commitment.[1] M.L. argues that there was insufficient evidence to support his commitment because Madison State Hospital ("the Hospital") did not prove by clear and convincing evidence that he was dangerous or that he was "gravely disabled," as defined by INDIANA CODE § 12-7-2-96. Concluding that there was sufficient evidence that M.L. was gravely disabled, we affirm the trial court's commitment order.

We affirm.

# Issue

Whether there was sufficient evidence to support the trial court's order for M.L.'s involuntary regular civil commitment.

# Facts

---

[1] In *Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 n.1 (Ind. 2015), the Indiana Supreme Court explained:

> In Indiana, an adult person may be civilly committed either voluntarily or involuntarily. Involuntary civil commitment may occur under four circumstances if certain statutorily regulated conditions are satisfied: (1) "Immediate Detention" by law enforcement for up to 24 hours; (2) "Emergency Detention" for up to 72 hours; (3) "Temporary Commitment" for up to 90 days; and (4) "Regular Commitment" for an indefinite period of time that may exceed 90 days.

(internal citations omitted).

[3] The mental health proceeding that is the subject of the current appeal is a continuation of proceedings involving M.L. that began in 2016.[2] On February 7, 2020, the Hospital filed a "Periodic Report on Regularly Committed Patient[,]" concluding that M.L. needed to remain at the Hospital. (App. Vol. 2 at 180). On February 12, 2020, without a hearing, the trial court issued an order continuing M.L.'s regular commitment. Thereafter, M.L. filed a letter with the trial court requesting a review of the commitment order. In response, the trial court held a hearing on March 4, 2020.

[4] During the March 2020 commitment hearing, the trial court heard testimony from M.L.'s treating psychiatrist, Dr. Vincent Porter ("Dr. Porter"). Dr. Porter testified that M.L. suffers from Schizo-affective Bipolar Type and that he is a danger to others and gravely disabled. As a basis for M.L.'s diagnosis, Dr. Porter explained that M.L.'s "beliefs in certain things are not necessarily what other people might believe in." (Tr. 5). Dr. Porter highlighted M.L.'s delusional thinking as follows:

> He thinks he has been cloned. He was sent here to be cloned. That the CIA and FBI are tracking everything that he does. He wants to get even with them through prosecution. And we are out to get him and are poisoning his food. That he is a Five Star general, a Star Ship commander, that extraterrestrial aliens have been implanting female organs in his body. They are implanting fetuses now. They have replaced his spinal cord, and they are

---

[2] M.L.'s original commitment was upheld in an unpublished memorandum opinion in 2018. *See M.L. v. Oaklawn OSJ*, No. 18A-MH-1114 (Ind. Ct. App. Oct. 30, 2018). The amended order of commitment entered under this underlying cause number was also upheld in an unpublished memorandum decision in 2019. *See M.L. v. Oaklawn Psychiatric Servs.*, No. 19A-MH-392 (Ind. Ct. App. Aug. 12, 2019), *trans. denied*.

doing electroshock on him and taking biopsies. . . . He also had three heart transplants, both kidneys replaced and pregnant with numerous aliens that are implanted in him. He is the president of the United States, bionic man, and needs a brain transplant and needs released from Madison State Hospital.

(Tr. 5-6). Dr. Porter further explained that M.L.:

[S]eems significantly devoted to reviewing old and various legal documents which include[] past medical histories that are extensive now in his collection and he repeatedly requests these documents. He's got records over and over from the same facilities, the same courts so much so he refuses to engage in his educational group activities in order to review these documents throughout the day and sometimes all night long.

He does go to the gym on a somewhat regular basis though for exercise. We're concerned that due to the physical harm that can occur with him staying up all night and dwelling on the paperwork that his health will decline. He is 64 years old. He needs his rest and sleep. So we were forced to limit and monitor and supervis[e] his access to these documents whether it be through the court system, other facilities for his own physical health.

(Tr. 6).

[5] Additionally, Dr. Porter detailed M.L.'s recent behavior at the Hospital, explaining:

As recently as three to four week[s] ago as an example, due to agitation and threats towards his peers, the staff had to move him from his unit for a couple of days until he calmed down for his safety. And directly now, directly due to his increasing level and frequency of verbal and physical encounters with his peers, we felt for his safety to transfer him to another alternate psychiatric unit within our facility that's for elderly population, less intense we hope.

(Tr. 7). Dr. Porter testified that M.L. "remains irritable, argumentative, unhappy and still very strongly delusional." (Tr. 10). Dr. Porter also expressed concern about "[M.L.'s] view about his reality and what other people may not see as reality. [M.L.] feels people are trying to harm him, going to kill him, and he feels compelled to be the first one to strike." (Tr. 10).

[6] Dr. Porter indicated that M.L. had been given three antipsychotic medications; however, there had not been any significant improvement in M.L.'s mental status. In his present condition, Dr. Porter did not believe that M.L. had met the criteria for discharge from the Hospital. Dr. Porter opined that:

> From our [perspective] he needs to be stable enough to function in the community. We do not believe he has met that criteria yet. His symptoms cannot be so pervasive as to not interfere in his day to day existence. And he has not met that in my opinion yet. He needs to have a six[-]month period without behavior; aggressive or physical, without threatening people, and I do not believe he has met that yet. And he needs to be willing to participate in his treatment which he is not doing at this time to a significant degree that I'm aware of.
>
> In summary, due to M.L.'s extensive refractory mental illness and ongoing aggression towards others and extensive delusions of being persecuted by numerous others and impaired judgment and his insight he remains gravely disabled, a danger to others, we are asking this court to provide a regular commitment so that we may continue our efforts to benefit M.L. by sufficiently stabilizing him so he can return to society as safely as possible.

(Tr. 8-9).

[7] M.L. also testified at the March 2020 hearing, stating "I do not believe that I am psychiatric, delusional, paranoid, bipolar, schizophrenic. I am a normal, disabled, 65[-]year[-]old male." (Tr. 12). He further testified:

> I have documents here from the federal government that say[] I have never talked about my case. I have never been told -- spoken about my case from no one, no one. I will not talk about it. I don't care who they are. So I could go around blind. It pisses me off they have me locked up in here and won't come forward. It is not my fault, it's not Dr. Porter's fault (inaudible). It's the CIA, or the Trump government (inaudible) forget or forgive or forget.
>
> * * *
>
> I'm not mentally ill. I do need to be reduced off of some of these medications. And as far as the population is concerned, I think more or less it's smoke and mirrors. Kids were trying to imitate and impersonate me. It's like lighting a match, hey, you aren't going to get that kind of fire started. And I am an officer and a gentleman. I am a high ranking military officer. I am not incorrigible and misfit man. I am an officer and a gentleman. I am not incorrigible, Your Honor, unfit and misfit.

(Tr. 12-13).

[8] Thereafter, the trial court granted the continuation of the regular commitment for one year. Based on M.L.'s behavior and the testimony at the hearing, the trial court found that M.L. "continues to demonstrate delusional behavior, remains psychotic and paranoid, and is still today gravely disabled and dangerous to himself and/or others." (App. Vol. 2 at 186). M.L. now appeals.

# Decision

M.L. contends that there was insufficient evidence to support his involuntary regular commitment because the Hospital did not prove by clear and convincing evidence that he was dangerous or gravely disabled. "'[T]he purpose of civil commitment proceedings is dual: to protect the public and to ensure the rights of the person whose liberty is at stake.'" *T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015) (quoting *In re Commitment of Roberts*, 723 N.E.2d 474, 476 (Ind. Ct. App. 2000)). The liberty interest at stake in a civil commitment proceeding goes beyond a loss of one's physical freedom, and given the serious stigma and adverse social consequences that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements. *Id.*

To satisfy the requirements of due process, the facts justifying an involuntary commitment must be shown by clear and convincing evidence. *In re Commitment of G.M.*, 743 N.E.2d 1148, 1151 (Ind. Ct. App. 2001). Clear and convincing evidence is defined as an intermediate standard of proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt. *T.D. v. Eskenazi Midtown Cmty. Mental Health Ctr.*, 40 N.E.3d 507, 510 (Ind. Ct. App. 2015). In order to be clear and convincing, the existence of a fact must be highly probable. *Id.* When we review the sufficiency of the evidence supporting an involuntary commitment, we will affirm if, "considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact

could find [the necessary elements] proven by clear and convincing evidence." *T.K.*, 27 N.E.3d at 273. (quotation and citation omitted).

[11] To obtain an involuntary commitment, the petitioner is "required to prove by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." IND. CODE § 12-26-2-5(e) (format altered). Because this statute is written in the disjunctive, the Hospital need only prove that M.L. is "either dangerous *or* gravely disabled[.]" *Id*. (emphasis added); *see also M.Z. v. Clarian Health Partners*, 829 N.E.2d 634, 637 (Ind. Ct. App. 2005) ("It is important to note that in order to carry its burden of proof, Clarian only had to prove that M.Z. was either gravely disabled *or* dangerous. It did not have to prove both of these elements.") (emphasis in original), *trans. denied*.

[12] M.L. does not dispute that he is mentally ill. Rather, he argues that there was insufficient evidence to support the trial court's conclusion that, as a result of his mental illness, he is dangerous or gravely disabled. Because we conclude that the evidence is sufficient to show that M.L. was gravely disabled, we need not address the trial court's findings regarding whether M.L. was dangerous.

[13] Gravely disabled is defined as:

> a condition in which an individual, as a result of mental illness, is in danger of coming to harm because the individual:
>
>> (1) is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or

> (2) has a substantial impairment or an obvious deterioration
> of that individual's judgment, reasoning, or behavior that
> results in the individual's inability to function independently.

IND. CODE § 12-7-2-96. Because the definition of grave disability is written in the disjunctive, the evidence needs to support only one of those two prongs for a person to be found gravely disabled. *See Civil Commitment of W.S. v. Eskenazi Health, Midtown Cmty. Health*, 23 N.E.3d 29, 34 (Ind. Ct. App. 2014) (explaining that a trial court's finding of grave disability survives if we find that there was sufficient evidence to prove either that the individual was unable to provide for his basic needs or that his judgment, reasoning, or behavior is so impaired or deteriorated that it results in his inability to function independently), *trans. denied*.

[14] Here, the record establishes by clear and convincing evidence that M.L. has a substantial impairment or an obvious deterioration of his judgment, reasoning, or behavior that results in the inability to function independently. At the March 2020 commitment hearing, Dr. Porter testified that he had been M.L.'s treating psychiatrist while M.L. was at the Hospital and that M.L. suffers from Schizo-affective Bipolar Type. Although M.L. had been given three antipsychotic medications, there had not been any significant improvement in his mental status. Dr. Porter explained that M.L. believed that "he has been cloned[,]" that hospital staff "are out to get him and poisoning his food[,]" and that "extraterrestrial aliens have been implanting female organs in his body." (Tr. 5). M.L.'s own testimony exhibited the extent of his delusions and paranoia. Furthermore, Dr. Porter detailed M.L.'s obsession with his medical and legal

records, which has affected his ability to engage in group activities. According to Dr. Porter, M.L.'s access to the records was limited and monitored "due to the physical harm that can occur with him staying up all night and dwelling on the paperwork[.]" (Tr. 6).

[15] In addition, evidence was presented that in order to meet the discharge criteria from the Hospital, M.L. needed six months of stable behavior to show that he could function in the community. Dr. Porter opined that M.L. had not been able to meet that criteria and that his symptoms were so pervasive that they interfered in his day-to-day existence. In support of his conclusion, Dr. Porter explained that in the weeks before the commitment hearing, M.L. had exhibited aggressive and threatening behavior towards his peers and the medical staff. As a result, M.L. was moved to an alternate unit for his safety. Dr. Porter further testified that M.L. "feels [that] people are trying to harm him, going to kill him, and [that] he feels compelled to be the first one to strike." (Tr. 10).

[16] All of the evidence in the record before us supports the trial court's determination that M.L. is "gravely disabled" for purposes of INDIANA CODE § 12-26-2-5(e). *See, e.g., Golub v. Giles*, 814 N.E.2d 1034, 1039 (Ind. Ct. App. 2004) (holding evidence sufficient to support finding that patient was gravely disabled where he suffered paranoia and delusional thoughts, engaged in threatening and destructive behavior, and refused to cooperate with anti-psychotic drug treatment), *trans. denied*. Therefore, we affirm the trial court's commitment order.

Affirmed.

Kirsch, J., and Tavitas, J., concur.