

FILED

Nov 21 2018, 9:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel M. Schumm
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Andrew B. Howk
Matthew M. Schappa
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Civil Commitment of T.W., <br><br> *Appellant-Respondent,* <br><br> v. <br><br> St. Vincent Hospital and Health Care Center, Inc., <br><br> *Appellee-Petitioner* | November 21, 2018 <br><br> Court of Appeals Case No. 18A-MH-1148 <br><br> Appeal from the Marion Superior Court Probate Division <br><br> The Honorable Steven R. Eichholtz, Judge <br><br> The Honorable Kelly M. Scanlan, Commissioner <br><br> Trial Court Cause No. 49D08-1804-MH-14684 |

**Altice, Judge.**

## Case Summary

[1] T.W. appeals the trial court's order for involuntary temporary commitment. He argues that the order is defective because it lacked the trial judge's signature and contained only the signature of a commissioner. Additionally, T.W.

contends that there was insufficient evidence to support his temporary commitment.

[2] We affirm.

## Facts & Procedural History

[3] T.W. is an intelligent young man in his late twenties who has been diagnosed with schizophrenia since 2013. T.W. does not accept this diagnosis but has participated in treatment and taken anti-psychotic medication at times. When properly medicated, T.W. is "very friendly, very engaging, [and] amiable". *Transcript* at 17. He is not aggressive and "does very well when he's on his medication." *Id*. at 20.

[4] A little over a year before the commitment hearing, T.W. was living with his mother until an incident occurred where he physically attacked her. T.W. was not taking his medication, and he became angry with his mother following a minor vehicle accident. He blamed her for distracting him while driving. When she responded and grabbed his hand, T.W. choked her and brought her to the ground. The police were called, and T.W. was taken to jail. No criminal charges were pursued against T.W., but he was taken before the court and ordered to take his medication. For the next eleven months, T.W. took his medication and attended outpatient treatment at Aspire. T.W. lived with his paternal grandmother, and his father (Father) regularly took him to treatment during this time.

[5]     In December 2017, T.W. unilaterally decided to stop taking his medication. According to Father, T.W. eventually became more reclusive and withdrawn and was easily agitated. T.W. stopped attending treatment. His paranoid behaviors increased, and he made multiple reports to the FBI, including that a friend was a member of ISIS. In March 2018, T.W. left a note at the local library warning that a bomb or chemical weapon might be in the area. Local law enforcement and the FBI had multiple interactions with T.W.

[6]     On or about March 22, 2018, T.W. told Father that he was going to kill him, which then resulted in a physical altercation. Father took the threat seriously and observed that T.W. expressed it with "more maliciousness" than prior threats. *Id.* at 20. The police were called, and T.W. was brought by police to the emergency department at St. Vincent Hospital.

[7]     T.W. was admitted to St. Vincent Stress Center between March 22 and 29, 2018. His treating psychiatrist, Erika Cornett, M.D. (Dr. Cornett), found T.W.'s diagnosis of schizophrenia to be evident. She noted his multiple contacts with the FBI and his delusional beliefs. T.W., however, continued to refuse to accept this diagnosis. Upon his discharge on March 29, T.W. refused to take his prescribed anti-psychotic medications. He did agree, however, to attend outpatient treatment at Aspire and take medication for anxiety.

[8]     On April 12, 2018, T.W. and Father had a meeting with members of the FBI. T.W. was warned by the FBI that his continued false reports could result in criminal charges. Father scheduled an emergency appointment at Aspire that

same day. At this appointment, T.W. became threatening and aggressive toward staff.

[9] As a result of T.W.'s threatening behavior, a physician with Aspire filed an application for T.W.'s emergency detention on April 12, 2018. The physician's emergency statement indicated, regarding the immediacy of the danger, that T.W. "has been non compliant with medications, is actively hallucinating, is extremely paranoid and exhibits extreme mood lability and potential for violence." *Appendix* at 19. The emergency detention was judicially authorized, and T.W. was admitted to Community North Behavioral Health on the afternoon of April 12, 2018.

[10] T.W. was apparently transferred the following day to St. Vincent Stress Center[1] and again treated by Dr. Cornett. Although T.W. exhibited paranoid delusions, he was not aggressive or agitated with Dr. Cornett. T.W. denied experiencing hallucinations, which had been reported by hospital staff. T.W. continued to reject his diagnosis, believing that he only suffers from OCD and anxiety. He took three doses of Risperdal, an anti-psychotic drug, but then refused to take any more due to the side effects, including extreme drowsiness.

[11] On April 17, 2018, St. Vincent Stress Center filed a petition for the temporary mental health commitment of T.W. In her physician's statement, Dr. Cornett opined that T.W. suffers from a psychiatric disorder, i.e., schizophrenia. In her

---

[1] The details of the transfer are not in the record.

professional opinion, Dr. Cornett also indicated that T.W. presents a substantial risk of harm to others and is, therefore, dangerous. Specifically, she noted that T.W. had threatened to kill Father and that Father is fearful of his safety if T.W. were released. Dr. Cornett also indicated that T.W. had acted threatening toward a therapist at the outpatient clinic. Dr. Cornett recommended a temporary commitment to the St. Vincent Stress Center.

[12] Commissioner Kelly M. Scanlan presided over the commitment hearing held on April 20, 2018, at which Dr. Cornett, Father, and T.W. testified. Dr. Cornett testified, among other things, that it was her professional opinion that T.W. was a potential danger to others. In this regard, she noted his refusal to take anti-psychotic medication and his resulting aggressive behavior. Specifically, she referenced his recent behavior at Aspire, his "several altercations" with Father, and reports that T.W. had threatened to "put a bullet in [Father's] head." *Id*. at 9. Dr. Cornett indicated a concern for "dangerousness and violence" if T.W. was released without the needed treatment. *Id*. at 12. Father echoed the same fears: "I mean … the key is I just don't want it to get to a situation where he might actually hurt someone. Or hurt himself." *Id.* at 22. He emphasized that T.W. needs to be medicated and testified that T.W. "is in complete denial that he even has a problem". *Id*. Indeed, T.W. testified that he "fully disagree[d]" with his schizophrenia diagnosis and stated that he was "perfectly fine" when he stopped taking his medications. *Id*. at 25, 29.

[13] At the conclusion of the hearing, Commissioner Scanlan expressly found by clear and convincing evidence that T.W. suffers from a mental illness and that he is both a danger to others and gravely disabled. Thus, Commissioner Scanlan granted the temporary commitment. On the same date, Commissioner Scanlan signed the written order for temporary commitment. T.W. filed a notice of appeal from this order on May 14, 2018.

## Discussion & Decision

### Defective Order

[14] We initially address T.W.'s claim that the order for temporary commitment is defective because it contains only the signature of Commissioner Scanlan and lacked the required judge's signature. Indeed, at the time the order was issued, Indiana law expressly barred Commissioner Scanlan from entering a final appealable order in this case. *See* Ind. Code § 33-23-5-8;[2] *Capehart v. Capehart*, 771 N.E.2d 657, 662 (Ind. Ct. App. 2002) ("magistrates and commissioners have identical authority").

[15] Regardless, T.W. has waived appellate review of this issue because he did not object to the commitment order at any point prior to this appeal. "'[I]t has been the long-standing policy of [the Indiana Supreme Court] to view the authority

---

[2] This statute has since been amended, effective July 1, 2018. The amendment removed the limitation regarding magistrates (and, thus, commissioners) entering a final appealable order. I.C. § 33-23-5-9(a), however, still requires that the court "enter the final order" in instances such as this.

of the officer appointed to try the case not as affecting the jurisdiction of the court' – and so 'the failure of a party to object at trial to the authority of a court officer to enter a final appealable order waives the issue for appeal.'" *In re Adoption of I.B.*, 32 N.E.3d 1164, 1173 n.6 (Ind. 2015) (quoting *Floyd v. State*, 650 N.E.2d 28, 32 (Ind. 1994)); *see also City of Indianapolis v. Hicks*, 932 N.E.2d 227, 231 (Ind. Ct. App. 2010) ("defects in the authority of a court officer, as opposed to jurisdiction of the trial court itself, to enter a final order will be waived if not raised through a timely objection"), *trans. denied*. "[A]ny objection to the authority of an adjudicative officer must be raised at the first instance the irregularity occurs, or at least within such time as the tribunal is able to remedy the defect." *Hicks*, 932 N.E.2d at 231.

[16] In *Hicks*, this court held that the appellant had waived a claim of error by failing to timely object to an order signed by a magistrate but not a judge. *Id*. We noted that the appellant called the trial court's attention to the error well after the deadline for ruling on the motion to correct error had expired. *Id*. In other words, the appellant "fail[ed] to challenge at the first instance an irregularity apparent on the face of the order" and "failed to raise the issue until a point when the trial court could no longer correct the error by issuing an amended order bearing the trial judge's signature." *Id*. Here, T.W. likewise failed to

timely object to the order that was signed by only Commissioner Scanlan.[3] We, therefore, conclude that he has waived the issue for our review.[4]

## Sufficiency of the Evidence

[3] The order was signed by Commissioner Scanlan on April 20, 2018, and T.W. filed his notice of appeal on May 14, 2018. T.W. had ample time between these dates where he could have filed an objection to the fact that the commitment order lacked a judge's signature.

[4] The dissent relies on a recent opinion issued by another panel of this court that found the identical issue (involving the same commissioner and judge) was not waived despite the fact that it was not raised at the trial level. *See L.J. v. Health & Hosp. Corp*, No. 18A-MH-152, slip op. at 7 n.4 (Ind. Ct. App. October 18, 2018). The *L.J.* court dismissed the appeal and remanded for the probate court judge to review the matter and enter a final order. We understand the strong desire to address the clear impropriety of the trial court's handling of the matter, which appears to be a pattern, but we cannot agree with its ultimate decision to dismiss the appeal. Our Supreme Court has expressly disapproved of decisions similar to *L.J.*:

> We conclude that it is improper for a reviewing court to dismiss an appeal on these grounds where no showing has been made that the issue was properly preserved. Instead, the reviewing court should deny relief on grounds of waiver. *Because the following recent decisions of the Court of Appeals hold that the proper procedure in such situations is to dismiss the appeal without regard for whether the issue has been properly preserved, the decisions are disapproved*: Cartwright v. State (1993), Ind. App., 621 N.E.2d 1164; *Kirby v. State* (1993), Ind. App., 619 N.E.2d 967; *Hill v. State* (1993), Ind. App., 611 N.E.2d 133 (2–1 decision, Buchanan, J., dissenting); *Scruggs v. State* (1993), 609 N.E.2d 1148, 1150 (2–1 decision, Buchanan, J., dissenting), *after remand*, (1994), Ind. App., 637 N.E.2d 175; *Green v. State* (1989), Ind. App., 540 N.E.2d 130, *reh'g denied*, (1989), 544 N.E.2d 172, *trans. denied*. We cite Senior Judge Buchanan's dissents in the *Scruggs* and *Hill* cases as correct statements of the law and precedent in this regard. We commend the Court of Appeals for properly applying these principles in *Briscoe v. State* and, accordingly, deny transfer in *Briscoe*.

*Floyd*, 650 N.E.2d at 32-33 (emphasis supplied). Indeed, the first case in the list disapproved by the Supreme Court – *Cartwright* – is on par with this case. There, a referee issued a judgment that was not adopted or approved by the trial court. Our court determined, like the dissent does here, that we lacked jurisdiction because no appealable final judgment existed. *Cartwright*, 621 N.E.2d at 1165. We explained: "While a referee, magistrate or commissioner may preside at a trial, they are not empowered to enter a final order or judgment." *Id*. Based on the trial judge's failure to adopt and approve the referee's judgment, we concluded:

> We regret the inconvenience this causes to both the appellant and appellee. However, it is incumbent upon the trial judges of this state to either properly appoint a judge pro tempore or a special judge, or to adopt and approve the actions of commissioners, magistrates and referees. Without strict adherence to the rules for the use of substitute judges, we lack jurisdiction to entertain the appeal.

*Id*. In *Floyd*, our Supreme Court rejected this type of analysis. We fail to see how the scale of the trial court's violation of the relevant statutes grants us the ability to disregard the Court's directive in *Floyd*.

[17] On review, we look to the evidence most favorable to the trial court's decision and all reasonable inferences drawn therefrom. *In re Commitment of J.B.*, 766 N.E.2d 795, 799 (Ind. Ct. App. 2002). Thus, we will not reweigh the evidence or judge the credibility of witnesses. *Civil Commitment of J.B. v. Community Hosp. N.*, 88 N.E.3d 792, 795 (Ind. Ct. App 2017). "If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, the order must be affirmed, even if other reasonable conclusions are possible." *J.B.*, 766 N.E.2d at 799.

[18] In an involuntary commitment case, the petitioner is required to prove by clear and convincing evidence: "(1) the individual is mentally ill and *either* dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." Ind. Code § 12-26-2-5(e) (emphasis supplied). "Clear and convincing evidence requires the existence of a fact to be highly probable." *J.B.*, 88 N.E.3d at 795.

[19] On appeal, T.W. does not challenge the trial court's determination that he is mentally ill. Rather, he contends that there is insufficient evidence to establish that he is either dangerous or gravely disabled. Because only one of these factors need be established to support an involuntary commitment, we focus our analysis on the sufficiency of the evidence regarding whether T.W. is dangerous.

[20] An individual is dangerous for purposes of the involuntary commitment statute where he, "as a result of mental illness, presents a substantial risk that the

individual will harm the individual or others." Ind. Code § 12-7-2-53. "The evidence must indicate 'that the behavior used as an index of a person's dangerousness would not occur but for the person's mental illness.'" *J.B.*, 88 N.E.3d at 796 (quoting *B.M. v. Ind. Univ. Health*, 24 N.E.3d 969, 972 (Ind. Ct. App. 2015), *trans. denied*). In this case, the trial court specifically found that T.W. was a danger to others.

[21] T.W. argues that St. Vincent Stress Center failed to offer clear and convincing evidence that he presented a substantial risk to others. T.W. notes that there was no evidence that he threatened or harmed anyone at the hospital in the days leading up to his commitment hearing. Further, he argues that his physical attack of his mother took place more than a year before the commitment hearing.

[22] We reject T.W.'s invitation to reweigh the evidence. The record establishes that when unmedicated, T.W.'s schizophrenia takes over and he becomes aggressive, paranoid, delusional, and dangerous. T.W.'s violent attack of his mother – choking her and taking her to the ground – happened at a time when he was not taking anti-psychotic medication. This violence led to his immediate arrest. Thereafter, T.W. took his medication as prescribed and attended outpatient treatment at Aspire for about eleven months. During this time, T.W. was back to his old, non-violent self. He was "very friendly, very engaging, [and] amiable". *Transcript* at 17. This quickly changed when in December 2017, T.W. decided to stop taking his medication and attending treatment. As a result, T.W. became reclusive, withdrawn, and easily agitated.

He made unfounded reports to the FBI regarding another individual and left a note at the library warning of a bomb or chemical weapons. Additionally, T.W. made violent, malicious threats against Father, which Father took seriously. T.W. also engaged in a physical confrontation with Father in late-March 2018, which led to police officers taking T.W. to the emergency department and a week-long admission to the St. Vincent Stress Center. Less than two weeks after his inpatient discharge, T.W. became threatening and aggressive toward Aspire staff during an outpatient therapy session on April 12, 2018. This led to his emergency involuntary detention that same day.

[23] Dr. Cornett testified that it was her professional opinion that T.W. was a potential danger to others due to his schizophrenia and refusal to take anti-psychotic medication. She indicated a concern for "dangerousness and violence" if T.W. was released without the needed treatment. *Id.* at 12. Father expressed similar fears that T.W. might actually hurt someone.

[24] "[A] trial court is not required to wait until harm has nearly or actually occurred before determining that an individual poses a substantial risk of harm to others." *C.J. v. Health & Hosp. Corp. of Marion Cty.*, 842 N.E.2d 407, 410 (Ind. Ct. App. 2006). Based on the evidence presented at the commitment hearing, a reasonable person could conclude that T.W. posed a substantial risk of harm to

others. Thus, we affirm the trial court's conclusion that T.W. was dangerous to others at the time of his temporary involuntary commitment.[5]

[25] Judgment affirmed.

Brown, J., concurs.

Tavitas, J., dissents with opinion.

---

[5] Because we conclude sufficient evidence was presented with respect to dangerousness, we need not consider T.W.'s argument related to the trial court's conclusion that he was gravely disabled. *See id.* at 410 n.3.

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Civil
Commitment of T.W.,

*Appellant-Respondent,*

v.

St. Vincent Hospital and Health
Care Center, Inc.,

*Appellee-Petitioner.*

Court of Appeals Case No.
18A-MH-1148

**Tavitas, Judge, dissenting.**

I respectfully dissent. I differ with the majority's determination that waiver analysis is dispostive here. I am guided by *In Re Civil Commitment of L.J.,* No. 18A-MH-152, slip op. at pp. 4-6, 8 (Ind. Ct. App. Oct. 18, 2018), in which a panel of this court recently held that the trial judge's entry of a blanket business record order summarily approving all of the commissioner's recommendations without review by the trial court warranted dismissal of the respondent's appeal and remand to the trial court judge to review the matter and enter a final order. The *L.J.* panel reasoned that, absent any evidence that the trial judge: (1) reviewed L.J.'s case; (2) specifically referenced L.J.'s civil commitment; (3) indicated an intention to affirm the commissioner's decision as the final order;

and (4) entered the affirmation of the commissioner's work under a business record cause number associated with L.J., the panel was "left without any assurance that the court fulfilled its obligation to review and 'enter the final order.'" *Id.* at 8.

[2] Several rules and statutes are relevant here. Appellate Rule 5(A), governing appeals from final judgments, provides: "Except as provided in Rule 4,[6] the Court of Appeals shall have jurisdiction in all appeals from Final Judgments of Circuit, Superior, Probate, and County Courts, notwithstanding any law, statute or rule providing for appeal directly to the Supreme Court of Indiana."

[3] Trial Rule 59(A) provides that a motion to correct error is a prerequisite for appeal only under the following circumstances:

> **(A) Motion to correct error--When mandatory.** A Motion to Correct Error is not a prerequisite for appeal, except when a party seeks to address:
>
> > (1) Newly discovered material evidence, including alleged jury misconduct, capable of production within thirty (30) days of final judgment which, with reasonable diligence, could not have been discovered and produced at trial; or
> >
> > (2) A claim that a jury verdict is excessive or inadequate.

---

[6] Appellate Rule 4 governs the jurisdiction of our supreme court.

> *All other issues and grounds for appeal appropriately preserved during trial may be initially addressed in the appellate brief.*

Ind. Trial Rule 59(A) (bold emphasis in original, italics added).

[4] A number of Indiana statutes in Title 33, governing courts and court officers, are implicated. Indiana Code Section 33-23-5-5, enumerating the powers of a magistrate judge, states nineteen acts that a magistrate "may" take.

[5] In April 2018, when the commitment order was entered, Indiana Code Section 33-23-5-8 provided as follows:

> Except as provided under sections 5(14) and 9(b) of this chapter, a magistrate:
>
> (1) does not have the power of judicial mandate; and
>
> (2) may not enter a final appealable order unless sitting as a judge pro tempore or a special judge.

Ind. Code § 33-23-5-8 (2008). Effective July 1, 2018, Indiana Code Section 33-23-5-8 was amended to eliminate the restriction on the ability of magistrates and commissioners to enter final appealable orders. The current statute, thus provides, "[e]xcept as provided under sections 5(14) and 9(b) of this chapter, a magistrate does not have the power of judicial mandate."

[6] Indiana Code Section 33-23-5-9 provides that, except in cases of a criminal trial or guilty plea hearing, a magistrate "shall report findings in an evidentiary

hearing, a trial, or a jury's verdict to the court" and "[t]he court shall enter the final order."

[7] Indiana Code Section 33-33-49-16, which specifically enumerates the powers of probate hearing judges and commissioners and is applicable here, states that an appointed probate hearing judge or probate commission "shall be vested by the judge of the probate division with suitable powers for the handling of all probate matters" including:

> (6) Taking or hearing evidence on or concerning matters described in this subsection or any other probate, guardianship, or trust matters in litigation before the court.
>
> (7) Enforcing court rules.
>
> (8) Making reports to the court concerning the judge's or commissioner's doings in the proceedings described in this subsection, including reports concerning the commissioner's findings and conclusions regarding the proceedings.

> *However, all matters handled by a hearing judge or commissioner under this subsection are under the final jurisdiction and decision of the judge of the probate division.*

I.C. § 33-33-49-16 (emphasis added).

[8] Indiana Code Section 33-33-49-16(e) states,

> A master commissioner appointed by the court under this section has the powers and duties prescribed for a magistrate under IC

33-23-5-5 through IC 33-23-5-9. A master commissioner shall report the findings in each of the matters before the master commissioner in writing to the judge or judges of the division to which the master commissioner is assigned or as designated by the rules of the court.

It is undisputed that the commissioner had authority to hear the petition for commitment; however, the commissioner did not have statutory authority to enter a final appealable order. *See* I.C. § 33-33-49-16(a) (stating that "all matters handled by a hearing judge or commissioner under this subsection are under the final jurisdiction and decision of the judge of the probate division"). I conclude, as did the majority, that the commissioner did not have authority to enter a final order here.

[9] The majority concludes that this issue is waived based on *Floyd v. State*, 650 N.E.2d 28 (Ind. 1994), and *City of Indianapolis v. Hicks*, 932 N.E.2d 227 (Ind. Ct. App. 2010), *trans. denied*. The instant case is distinguishable from *Floyd* and *Hicks* because this case involves a blanket policy of the trial court rather than a mere oversight. A rash of cases involving potentially defective commitment orders have appeared before us, and panels of this court have reached varying conclusions in conducting appellate review. In my view, much-needed clarity could be supplied in the form of a statute or court rule specifically tailored to cases in which litigants risk waiving their claims of error due, not to the litigant's acts or omissions, but rather, owing to the acts or omissions of presiding trial judges.

[10] The instant case is not a case in which an inadvertent oversight by the trial court resulted in a final order that was not approved by the trial court judge. Rather, here, as in *L.J.*, the trial court judge expressly abdicated his statutory duties under Indiana Code Section 33-33-49-16. The trial court judge issued a blanket order under the court business docket, which summarily approved all recommendations of the court commissioner without specifically reviewing the case(s) and indicating the trial court judge's intention to approve the commissioner's recommendations relating thereto. In so doing, the trial court clearly delegated to the commissioner, without statutory authority, the trial court's duty to render final decisions.

[11] Here, the trial court judge was required to enter a "decision," pursuant to Indiana Code Section 33-33-49-16(a) and failed to do so. The waiver analysis employed by the majority falls short under these unique circumstances because the respondent is penalized for failing to "timely" urge the trial court judge to perform his or her statutory duty. A litigant cannot waive a trial court judge's exercise of statutory responsibility.

[12] Deeming the defective order issue waived because it was not raised below effectively allows the trial court judge to abdicate his duties and obligates the litigant to remind the judge of his duties by filing a motion in the very court that has abandoned its duties. Such abdication by trial court judges should not be litigants' and appellate courts' problem to resolve.

[13] Again, I suspect that clarification, by statute or trial rule, of a litigant's risk of waiver under circumstances such as these may be necessary. Perhaps a trial rule that addresses such a defect would assist litigants who are filing an appeal inasmuch as a motion to correct error was not required here before T.W. initiated his appeal. By what mechanism does a litigant who finds him/herself in this situation receive notice of the significant, and likely certain, risk of waiver? A trial rule or statute that discusses waiver and prescribes a time frame for raising the issue before the trial court would put such a litigant on notice in cases in which the underlying order was not duly approved and counter-signed by the trial court judge.

[14] Due to the plain language of Indiana Code Section 33-33-49-16(a), I find that the order of commitment was not a final appealable order. As in *L.J.*, we should "reject the trial court's entry of a business record with no reference to specific case numbers as a method for adopting the findings and conclusions of a magistrate or commissioner as to any specific case heard during a specified time period" and determine that the underlying commitment order is not a final order. *See L.J.,* No. 18A-MH-152, slip op. at p. 3.

[15] For these reasons, the underlying commitment order here is defective because the trial judge did not specifically review and approve the commissioner's recommendations as to T.W. Accordingly, I would remand to the trial court for review and approval of the commissioner's recommended order for temporary commitment. I acknowledge that the issue is moot as to this

particular appellant; however, to correct the record, such approval by the trial court judge is necessary.